The opinion of the court was delivered by
Duncan, J.
The most material question, and, from the view of .the subject taken by the court, the only one, is, — Was the penal bijl, on which.this action was brought, joint only, or joint and several ?
It is not possible to distinguish this ease from Moneugh v. Butler’s Administrators, decided by this court. In that case, the words were, — “We bind our heirs, executors and administrators, and each of our heirs, executors, and administrators;” in this, instead of each, it is every of them. All of them would have been joint, every of them is several; and the natural construction, the common signification of these words would be, that the respective heirs of the obligors were intended to be bound. Without travel-ling again over the ground, the court, though they acknowledge the ability with which this cause has been argued, remain of the same opinion. But new ground has been taken, which it is proper not to pass over without notice. The stress of (the present argument is, the weight, as is supposed, of authoritative decisions on the very same words, and a recent decision of the Supreme Court of the United States, in Hunt v. Rousmanier, 8 Wheat. 174, and the mischief of rash innovation and collision with the Supreme Court of the United States. It is candidly admitted that if it was res integra, the construction put on these words by the court in Mo-neugh’s case is the proper and natural one. Yet no such direct authority has been produced, and the decision in Hunt v. Rous-manier was on a very different subject, in which was considered immediately and by way of illustration, the general doctrine of relief in chancery, where a bond was made joint, instead of joint and several, by modifying the bond, and treating is as a joint and several one. No opinion was given on the effect of any words. The doctrine of rectifying these obligations, is not a very ancient one, and the distinction taken as to equities pre-existent to the bond, from the advance of money to both, and other cases, is quite a novelty. The whole scope of that very able opinion, is in accordance with the view the court has taken of these instruments; for Chief Justice Marshall, in that case, has examined the modern decisions, and has given the result with that accuracy and clearness which distinguish all his investigations. The first cases, he says, had no relation to a previous credit given to the obligors. Chancery placed them on mistake of fact, arising from the ignorance of *159 the draftsman, and inferred from the nature of the condition and the transaction, that the obligation was made joint by mistake; that is, the instrument was not what the parties intended; in fact, they intended a joint and several obligation; the scrivener has, by mistake, prepared a joint obligation. So, in Simpson v. Vaughan, 2 Atk. 33, where the bond was drawn by the obligor himself, and under circumstances which induced the chancellor to be of opinion, that it was intended to be a joint and several bond, he so decreed it. The cases with respect to partners, or those who have reaped a benefit by the advance of money or of credit, proceed on a different principle; and these cases only decide, that the mistake in point of fact will not be presumed, where no equity existed antecedent to the obligation; where no advantage was received by, or credit given to the person, against whose estate the instrument was to be set up; but where a joint obligation has been given, and a benefit received by the deceased obligor, then the court is to presume a mistake in point of fact. And where there was no ingredient of fraud, as in the case of Hunt v. Rousmanier, the court reformed a written instrument, on account of mistake in law and ignorance of the scrivener, and there said, though they found no such principle asserted in the books, yet they found no case to the contrary, in which it had been decided, that a plain and acknowledged mistake is beyond the reach of equity; and compared it to the reformation of a bond made joint by the ignorance of the draftsman, into a joint and several bond, by decrees in chancery. Théy concluded by declaring, “ that where the effect of the instrument is entirely misunderstood by the pariies, they would not, in such case, say, that a court of equity was incapable of giving relief.” So, here, considering the nature of the transaction, the purchase money of land sold and conveyed, the long extension of credit, on obtaining the security of Potter’s name, where the intent is so apparent, and where all were ignorant, obligors, obligee, and-scrivener, and all acted under a belief, that the bond would create a lien on Potter, the father-in-law, not subject to the contingency of the son surviving his father-in-law, I would, sitting as a chancellor, long pause before I would say, that a court of equity ought not to grant relief and rectify the bond. And here, where we have no court of chancery, and where we presume that to have been done, which a court of chancery would decree to be done, I am not quite satisfied, whether a court ought not to say to a jury, “ If you find from these facts, that the instrument was, in fact, not what the parties intended; that they intended a joint and several obligation, and the scrivener had prepared a joint one, then you are to find the obligation to be a joint and several one;” for it would seem to me to be a clear principle of equity, that the mistakes of the drawers of deeds and instruments, áre subjects for relief, even with strictness, in a court of equity, and may be rectified according to the true intention of the parties; but the proof of the *160 mistake ought to be clear and satisfactory. Chief Justice Kent, in Gillespie v. Moore, 2 Johns. Ch. Rep. 599, says, in Simpson v. Vaughan, 2 Atk. 31, Crosby v. Middleton, Pre. in Ch. 309, Burn v. Burn, 3 Vez. 573, a mistake in a bond was shown by parol proof bn the part of the plaintiff, and the bond amended; though, in two of the cases, the obligor was dead, and, in the third, the lapse of time had been very great, and' the party, against whom the correction was allowed, was a surety. And there the principle is decided, that equity relieves against a mistake, as well as fraud in a deed or contract in writing. The presumption of law is, where it is against obligors, who have received a benefit, that there was a mistake in making the bond joint, instead of joint and several, but where the deceased obligor is but a mere surety, there the evidence of mistake in fact must be full and satisfactory; but, like other facts, it may be inferred from the nature of the debt, and all the circumstances- of the transaction. We are not operated on by recent English decisions on this subject, but it is some satisfaction to Observe the progress of this doctrine in that country. In Ex parte Symonds, 1 Cox, 220, it was decided, that where it appeared on the face of a bond that it was intended to be joint and several, both courts of law and equity will consider it as joint and several; but a court of equity will go further than a court of law, and when a bond in form is only a joint one, and it is suggested to have been the intention of the parties to make it joint and several, the court will refer it to a master to ascertain what was the intention of the parties. Rut it ought not to have been left to the jury, on any supposed equity arising from subsequent events; equities not existing at the execution of the bond, nor is there any equitable principle, on which to charge the estate of Potter, if discharged at law, arising from the devise of Potter to his daughter, the wife of the principal debtor. It. has no relation to the matter; it is nothing more nor less than this, — that, there is a debt due by the defendant to the principal debtor; to him or to him and his wife, under the will of John Potter; therefore, there is equity, that John Potter’s estate should pay the father of his son-in-law, a debt discharged in law. It would be, as was justly observed, not recovered, because there was a debt due by the defendant to the plaintiffs, but because there was a debt due by the estate of the testator to the co-obligor with the testator, which was discharged by his death. This is an equity, not within judicial grasp; and it would introduce mischievous uncertainty, if, because there was no court of chancery, we should assume not only chancery jurisdiction, but transcend the powers of chancery, and either leave it to a jury or court to decide themselves, on some unknown, unacknowledged, personal equity, arising, ex re nata; for when the common law courts exercise chancery powers, they are as much bound by rules of courts of equity, as if they acted directly as chancellors, and courts of equity are as much bound down by rules as courts of common law.
*161 Joint obligations and joint estates must depend on the construction of the words creating them. Are they words of jointure, or are they, by any latitude of construction, susceptible of a contrary construction ? If the words, and every of their heirs, would make a tenancy in common, the same words, when applied to executors and administrators, would create a joint and several obligation. Independent of the feudal reason in favour of the survivor, to prevent the splitting up of services, there is another reason in favour of the doctrine, which never could apply to a man taking a security besides the obligation of his debtor; for it may be said, that if two men make a purchase, there is a chance between themselves which of them shall survive; but no man would take a chance of living, where he could gain nothing; no man would take a wealthy old man, as a security for a poor young one, and part with the title of his land on that security, on the chance of old age and infirmity surviving youth and strength. The jus accrescendi is not attended by such unqualified hardship, as the doctrine of joint obligation; yet that right is so odious, that Lord Haedwicke says, “ Courts, both of law and equity, have taken a latitude in construing against jointenancy, on the ground of intent.” Ryder v. Villers, 2 Vez. 353. The truth is, the judges have not felt strong enough to blot out for ever the whole doctrine: yet they have with avidity seized the slightest implication in the instrument, to make it several. When, in Fisher v. Wigg, 1 P. Wms. 14, it was determined, about one hundred years ago, that the words equally divided, created a tenancy in common, there was the usual outcry against innovations; and Lord Chief Justice Holt, the brightest name that ever appeared on judicial records, was so bigotted to the feudal doctrine of survivorship, that he opposed the other judges with all the force of his mighty mind, as if it was rooting up the foundations of the common law, and as if he was contending pro arts etfocis. Yet, with all the reverence with which the opinions of that great judge have been considered, Lord Haedwicke says, that the arguments of the other judges are more founded in the nature and reason of the thing, and Holt’s more founded on artificial arguments, and drawn out from a great deal of fine learning in other cases. Lord MaNspield agrees with Lord Haedwicke, and says, the opinion of the other judges was the more liberal opinion, and better founded in law. The controversy in Ryder v. Fillers, was whether the words, equally to be divided, would make a tenancy in common in a deed, as it would in a will. There Lord Haedwicke said, though the distinction had been laid down so in the books, there was no reasonable difference in the regulation of estates, between the construction of a deed and a will, as there might be in their limitations; but that the words, equally to be divided, are words of modification and regulation, and not of limitation. That these words, or words of the same import, would make a tenancy in common, appears by the cases cited by the'coun- *162 sel of the defendant in error, to have been determined by this court. Indeed, the true line is compressed in one short sentence, by .the Chief Justice, in Martin v. Smith, 5 Binn. 16: If there is any intimation of severalty of interest in the instrument, it is sufficient to make a tenancy in common.” So, here, if there is any intimation of severalty of obligation, it makes the bond several, as to them and their heirs respectively, so binding them and their respective heirs. And, in M'Pherson v. M‘Pherson, Addison, 37, (in the Court of Errors and Appeals,) the court admitted, there was no precedent for construing the words of the will under consideration, to make a tenancy in common; yet the majoi'ity of the court gave that construction to them, because they said “ the construction was in the spirit of former decisions, and there was a time when there was no precedent for construing a tenancy in common, from the words equally to be divided.” And I may certainly, without disrespect, say of the opinion of the minority, as was said of Lord.Hoi/r’s opinion, that it was less liberal, and not.so much founded in the nature and reason of the thing. There the devise was of a plantation to A. and B., his sons, and their heirs; and, if my son C. come and demand the plantation, then it is my will, that my sons A. and B, or their heirs, should peaceably yield up the possession to him; and the court say, the natural, if not necessary construction, was, that his sons, if both alive, should give it up;-or if either of them was dead, that the survivor and the heirs of the other, should give it up, or that,-if both were dead, the heirs of both should give it up. Now, when these obligors bound themselves, and their heirs, executors, and administrators, and every of them, the natural construction is, not that the survivor alone should pay, or the executors and administrators of the survivor, but every, that is, each of the executors and administrators, or rather the executors and administrators of each obligor; for every of the executors and administrators would not be. bound, if it was not a several obligation, but only the executors and administrators of the survivor. We do not think that we are, by this construction, violating any principle of law, or unsettling any rule of property; we are not departing from the settled rule of the construction of words limiting estates, but giving effect to words regulating and modifying the payment of an obligation; providing that on the death of every one of the obligors, every one of their executors and administrators should be bound. These words should be taken according to their proper and most known signification, that is, that which is most vulgar and in use, (Plowden, 169;) and it is the duty of the court to give effect to every instrument, according to its intent, however inartificially it may be drawn. This is not legislation, abolishing the effect of a legal instrument or joint bond; that, as we have in the former case said, can only be done by the legislature; but construing the words of an instrument, — in order to ascertain whether it is a joint or a joint and several bond, — and using, I admit, some latitude in the *163 construction, to effect the end of the obligation, which would be defeated if it were construed joint, and to preserve from destruction that security, when it never was in the contemplation of either the scrivener who drew, the parties who executed, or the party to whom it was given, that the death of the security discharged his esiate; that there existed in law such a principle, that if one obligor died, the obligation quoad him, died with him, and that the obligee has, in that event, the poor remedy against an insolvent debtor, to whom he never would have extended so very long a credit, without a certain and not a contingent security; for there is a struggle of the mind against a consequence so absurd and unjust— where the rule is an arbitrary one, having its origin, when jointe-naney was a favourite tenure, and is so much at variance with common sense and common honesty. The rule first obtained when there was little personal credit, and was of simple origin; and these rules, which become in time and from circumstances incontrovertible, have been constantly relaxing, by a series of persevering' innovations; as the doctrine of distress for rent. At one time, it was the general law, that whatever was found on the premises was subject to distress. Principles of public convenience, extensive in their nature, demanded an exemption of some goods of a certain description and in certain situations; and these exemptions, — so much in favour of commerce and agriculture, — courts of justice ai’e gradually extending. The right of survivorship has been modified, and even in the transfer of lands, our courts have often departed from it, where a joint warrant has been taken out. So the whole doctrine of reforming bonds in chancery; and it is in this spirit that the courts began, more than a century ago, to conform their rules of the construction of words not technical, and therefore not inflexible, to common understanding and the constant variation of language, and wherever there is the slightest indication of intention to create a severalty, it is permitted to alter the legal result; and sureties, as well as principals, must be bound according to the true construction of the obligation. The common law recognized no such distinction as of late has been introduced in chancery, in presuming an intention to make a bond joint and several against principals. I admit, that the cases of application to chancery to reform obligations, may be of obligation in this form, and afford some evidence of judicial understanding; yet, if these opinions are not supported by law and reason, the convenience of mankind requires that they should not be blindly followed or slavishly adhered to, when it must be granted that the whole doctrine of jointenancy and survivorship, has changed and is changing; and we are only following up what has been done by the highest tribunal of the state, the Court of Errors "and Appeals, in deciding this case in the spirit of former decisions. And, though it maybe the first precedent, I do not consider it as removing or violating a tittle of the common law, on which a rule of property depends, but as giving to this form *164 of words, their present, common and received acceptation; for all the cases in the common law courts, from. Fisher v. Wigg down to the present day, all the interpositions of chancery are founded on the same spirit, that jointenancy and joint obligation, though once favourites in courts of justice, have, from their little adaptation to the present state of society, the increase of credit, and consequently, of written obligations, and from their manifest injustice and absurdity, become odious. It may justly be said of it, as has been said of another doctrine of the common law, viz. that a freehold cannot be made to commence in futuro, that it has no good ground to stand on, and judges will be astute to get over it, (2 Wils. 166;) and there never was a rule of law so inflexible, that it will not recede from words not technical, to enforce the intention of the parties, Parkhurst v. Dormer, Willes, 332. Too much regard is not to be had to the natural and proper signification of words and sentences, to prevent the simple intention from taking effect. The law is not so nice in grants, and therefore it does ofien transpose words, contrary to their order, to bring them to the intent of the parties. These rules, as Lord Chief Justice Wil-ms, himself an eminent judge, says, he has collected from Littleton, Plowden, Coke, Hobart, and Finch, persons of the greatest authority; and that neither false Latin nor false English will make a deed void, if the intention appears. And, in Crossing v. Scuddamore, Lord Chief Justice Hale cites the opinion of Lord Hobart, Hob. 277, and declares himself to be of the same opinion, that judges ought to be curious and subtle to invent reasons and means to make acts effectual, according to the just intention of the parties; and, as Willes observed, judges of these latter times, — and he thinks very rightly, — have gone further than formerly, and have had more consideration for the substance than the shadow. Wilkinson v. Tranmarr, Willes, 684. And where a general principle for the construction of an instrument is once laid down, courts will not be restrained from making their own application of it, because there are cases in which it may have been applied in a different manner; and, except in words of limitation, courts are bound to give the same effect to intention in a deed as in a will, and though there is always a presumption in favour of the technical meaning, this is no more than a presumption, and is to be controlled by the manifestation of a contrary intent; and where that, on the face of the instrument, is clearly and satisfactorily ascertained, and is not contrary to any rule of law, the court is bound to construe it conform-ably to that intent; and this is now the established rule of construction, as it ought always to have been.
As the court are of opinion, that the penal bill was a joint and several obligation, the errors assigned could not damnify the plaintiffs in error, as the question of equity on which the court gave their opinion did not arise. The judgment must be affirmed.
Judgment reversed.